Filed 7/2/14  In re D.D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.D., a Person Coming Under the Juvenile Court Law. | D065348 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. SJ11900D) |
| Plaintiff and Respondent, | |
| v. | |
| DIANA A. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant Diana A.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant Cameron D.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Diana A. and Cameron D. appeal juvenile court orders terminating their parental rights to their son, D.D. Diana contends the court abused its discretion by denying her request for a continuance of the Welfare and Institutions Code section 366.26[1] hearing and in denying her section 388 petition. She also asserts the court erred by finding the sibling relationship exception to termination of parental rights and adoption did not apply, and by not exploring the option of guardianship. Cameron maintains the section 366.26 report by the San Diego County Health and Human Services Agency (the Agency) was insufficient, and he was wrongly deprived of visitation with D.D. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2012, the Agency petitioned on behalf of five-month-old D.D., alleging Cameron and Diana used marijuana to excess. Cameron admitted smoking it every day and that he and Diana had used methamphetamine together; Diana, who had an extensive drug use history and had her parental rights to her three older children terminated because of her inability to address her substance abuse issues, acknowledged using marijuana with Cameron. The petition also alleged Diana and Cameron had been arguing and hitting each other while holding D.D.

Diana was pregnant at the time of the petition. She and Cameron had lived with the paternal grandmother, Beverly J., for three months, but Beverly had asked them to leave because of their arguments and the traffic going in and out of her apartment while they were there. Diana's criminal history included two arrests for drug possession. Cameron had been convicted of robbery, burglary and petty theft, and had a recent arrest for false imprisonment and for carrying a concealed dagger. Diana said she had used marijuana for 15 years and

---

1 All further statutory references are to the Welfare and Institutions Code.

2

methamphetamine off and on for eight years. She had been in two substance abuse treatment programs, but resumed drug use after completing them. Diana began voluntary services, but her visits with D.D. were inconsistent and she lost touch with her therapist.

At the jurisdictional/dispositional hearing on September 20, 2012, the court found the allegations of the petition to be true, declared D.D. a dependent child of the court, placed him in relative care and ordered services for both parents. D.D. was placed with Beverly. Diana's participation in reunification services was minimal. Her doctor ordered her to bed rest in November 2012 during the last weeks of her pregnancy. The Agency was prepared to take reunification services to her, but Diana did not inform the Agency of her whereabouts. In January 2013, she gave birth to twins. They remained in her care and she was offered voluntary services for them.

At the six-month review hearing on March 20, 2013, the court continued D.D. in relative care and continued Diana's services, but terminated services for Cameron.

On May 17, 2013, the Agency petitioned under section 388, requesting the court terminate Diana's services and set a section 366.26 hearing. It argued Diana had made no effort to participate in services since the six-month review hearing, had not maintained contact with the Agency and had no visits with D.D.

On May 24, 2013, Diana contacted the Agency and reported she had been having problems with her phone and she and the twins were living with a family friend. She had one visit with D.D., but did not appear for the next scheduled visit. She was discharged from substance abuse treatment for missing classes.

On August 9, 2013, the court granted the Agency's section 388 petition, terminated Diana's reunification services regarding D.D. and scheduled a section 366.26 hearing.

3

D.D. continued to live with Beverly. The social worker reported that in July 2012, Cameron had told Beverly he would kill her if D.D. were taken away from them. The Agency temporarily removed D.D. until Beverly moved to a confidential address and obtained a restraining order against Cameron. The social worker reported the parents' supervised visits with D.D. were affectionate, but visits were inconsistent, and Diana did not visit him for two months after she gave birth to the twins. In September and October 2013, D.D. had supervised visits at Diana's home. In October 2013, Diana tested positive for methamphetamine and the twins were taken into protective custody and placed with Beverly.

The social worker assessed D.D. as highly adoptable. He had thrived in Beverly's home and she was committed to adopting him. The social worker recommended terminating parental rights so D.D. could be adopted.

At the section 366.26 hearing on January 17, 2014, the social worker testified each parent was currently having visits with D.D. Cameron's visits were at the jail where he was incarcerated for possessing a controlled substance.

During the hearing, Diana's counsel made an oral motion under section 388, requesting additional time for reunification or, alternately, placement of D.D. with Diana. Counsel argued changed circumstances existed because the court had ordered reunification services for Diana in the twins' case, and the modification would be in D.D.'s best interests. The court denied the motion, finding Diana had not shown a sufficient change in circumstances.

The parties stipulated if Cameron were to testify, he would say he loves D.D. and was willing to participate in reunification services.

After considering the evidence presented and argument by counsel, the court found D.D. was likely to be adopted if parental rights were terminated and none of the statutory exceptions to

4

termination of parental rights and adoption applied.  It terminated parental rights and referred D.D. for adoption.

## DISCUSSION

### I.

Diana asserts the court erred by denying her request to continue the section 366.26 hearing. She argues the court had granted reunification services to her in the twins' case, and a continuance was in D.D.'s best interests because there was a real possibility she would reunify with the twins.

The juvenile court may grant a continuance only on a showing of good cause.  "[T]he court shall give substantial weight to a minor's need for prompt resolution of his or her custody status . . . ."  (§ 352, subd. (a).)  "Continuances are discouraged [citation] and we reverse an order denying a continuance only on a showing of an abuse of discretion [citation]."  (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810-811.)

Diana has not shown an abuse of the court's discretion.  Diana had a long history of substance abuse and of neglecting her children.  She had failed to reunify with her three older children.  Her visitation with D.D. and her participation in reunification services during the many months of his dependency had been inconsistent.  The court acted well within its discretion by determining it would not be in D.D.'s best interests to delay his permanency by continuing the proceedings for six months on the chance Diana would change her usual pattern and regularly participate in services and visit D.D.  She has not shown an abuse of the court's discretion.

### II.

Diana contends the court abused its discretion by summarily denying her section 388 petition in which she sought additional reunification services or, alternately, D.D.'s placement

5

with her.  She argues the court erred by not holding an evidentiary hearing and she was denied due process.

Section 388 provides in part:

> "(a) (1)  Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. . . .
>
> [¶] . . . [¶]
>
> "(d)  If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . the court shall order that a hearing be held . . . ."

To obtain the relief sought in a section 388 petition, the petitioner must show both a change of circumstances or new evidence and that the change sought is in the child's best interests.  (§ 388; Cal. Rules of Court, rule 5.l570(a)(7); *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)  A petition is liberally construed in favor of its sufficiency.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461.)  The petitioner bears the burden of proof, however, to make both showings.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

" ' "The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." ' [Citations.]"  (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.)  "[I]f the petition presents *any* evidence that a hearing would promote the best interests of the child, the court must order the hearing."  (*In re Angel B., supra*, 97 Cal.App.4th at p. 461.)

Diana has not shown an abuse of the court's discretion.  She did not make a prima facie showing entitling her to an evidentiary hearing.  The court stated it was deciding the petition on the merits, rather than on the fact it was untimely.  It stated Diana had not shown a sufficient

6

change of circumstances. Although the court may have misspoken by indicating it was deciding the petition on the merits, rather than on the lack of a prima facie showing, it never indicated it had found that Diana had made a prima facie showing. Further, Diana does not indicate any additional evidence she would have offered at an evidentiary hearing beyond that presented at the section 366.26 hearing. She has not shown prejudicial error or a denial of due process.

The court's denial of Diana's petition is well supported. The court could have denied services outright in D.D.'s case because of Diana's continued substance abuse after losing custody of her older children through her failure to successfully address her substance abuse issues. After she was given the opportunity to regain custody of D.D., her substance abuse continued, her participation in services was inconsistent, she did not stay in contact with the social worker and she missed visits. The fact that services recently had been ordered to help her reunify with her infant twins did not show changed circumstances to justify continuing D.D.'s dependency for another six months. Diana had been participating in a voluntary case plan with the twins in an effort to keep the family together without declaring the twins dependents of the court. Then her positive drug test caused the court to declare the twins to be dependents and to order reunification services. Circumstances had not changed for the better for Diana, but for the worse. Court-ordered services constituted a more formalized arrangement, and Diana was given a specific timeframe to successfully participate in services or face the possibility of termination of her parental rights to the twins.

Further, Diana did not show that placement with her or a continuance of the proceedings would be in D.D.'s best interests. She has a long history of parental neglect and not placing her children's needs as her top priority. At the time of the hearing, D.D. needed permanence and stability, which he would gain by being adopted by Beverly. He had thrived in Beverly's home.

7

She had shown a commitment to him by caring for him for the many months of his dependency and was willing to adopt him. Diana has not shown an abuse of the court's discretion.

III.

Diana asserts the court erred by not applying the sibling relationship exception of section 366.26, subdivision (c)(1)(B)(v) to termination of parental rights. She argues applying the sibling relationship exception would not interfere with implementation of a guardianship.

Adoption is the permanent plan favored by the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds by clear and convincing evidence that a child is adoptable, it becomes the parent's burden to show that termination of parental rights would be detrimental to the child because of a specified statutory exception to termination of parental rights and adoption. (*Id.* at p. 574.)

Under section 366.26, subdivision (c)(1)(B)(v), if the court finds the child will be adopted within a reasonable time, adoption must be ordered " 'unless the court finds a compelling reason for determining that termination [of parental rights] would be detrimental to the child' because '[t]here would be substantial interference with a child's sibling relationship . . . .' [Citation.]" (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 811.) The purpose of this exception is to preserve long-standing sibling relationships that serve as "anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) The sibling relationship exception contains "strong language creating a heavy burden for the party opposing adoption." (*In re Daniel H.*, at p. 813.) Factors for the court to consider include the nature and extent of the sibling relationship; whether the siblings were raised in the same home; whether they share a close bond; and whether continued contact is in the child's best interests, as compared to the benefits of

8

adoption. (*Id*. at p. 811.) The court considers the best interests of the adoptive child, not the best interests of the other siblings. (*Id.* at p. 813.)

Diana has not shown error by the court not applying the sibling relationship exception. Beverly was caring for the twins as well as for D.D. while Diana was receiving reunification services in the twins' case. Thus, terminating her parental rights to D.D. would not substantially interfere with D.D. and the twins' relationship. Moreover, D.D. was not quite two years old and the twins were babies. They had lived together for only three months and the social worker said D.D. did not appear to have much of a relationship with the twins. There was no showing that the benefits of maintaining the sibling relationship would outweigh the benefits to D.D. of adoption. Diana has not shown error.

Diana's argument that the Agency should have explored with Beverly the option of guardianship is misplaced. Adoption is the favored permanent plan. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 573.) Neither the statutory scheme nor relevant case law indicates there is an affirmative duty to discuss guardianship when a prospective adoptive parent has indicated a positive desire to adopt a child. Moreover, there is nothing in the record to indicate that guardianship was not discussed with Beverly.

IV.

Cameron contends the Agency's assessment report was inadequate because it did not sufficiently describe D.D.'s developmental status, and it did not sufficiently describe D.D.'s relationships with Beverly or Cameron. He also argues the Agency deprived him of the opportunity to visit D.D. regularly while he was in custody, and this precluded him from maintaining a beneficial parent-child relationship with his son.

9

Assuming that Cameron has preserved these issues for appeal, he has not shown error. In determining whether it is likely a child will be adopted, the Agency provides an assessment report that focuses on whether the child's age, physical condition and emotional state will make it difficult to find a family willing to adopt him or her. (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) It is not required that the report describe with certainty the child's future medical condition. (*In re Helen W.* (2007) 150 Cal.App.4th 71, 79.)

The assessment report adequately described D.D.'s age and physical and emotional condition. At the time of the report, he was 21 months old and had been placed with Beverly for 14 months. The social worker reported D.D. was healthy and had no behavioral or emotional problems, but a developmental screening in May 2013 had shown some concerns with communication and motor skills, and he would undergo a complete developmental evaluation as a part of the adoption process. Beverly said she had no concerns about his development and he appeared developmentally on track. The report adequately described D.D.'s developmental status, and there was nothing to indicate any potential problem that would interfere with his adoption.

The social worker who wrote the assessment report acknowledged he had not personally observed any visits between Cameron and D.D., but relied on the reports from the previous social worker to state his opinion that Cameron and D.D. did not share a parent-child relationship. The previous social worker described a visit between Cameron and D.D., stating Cameron was affectionate with D.D. throughout the visit, held him, fed him and changed his diaper. The social worker said five-month-old D.D. appeared tense for the first 10 to 15 minutes, but then relaxed. The current social worker described Beverly's relationship with D.D., and noted D.D. and his parents had lived with Beverly during the first three months of D.D.'s life. He said D.D. and Beverly had a close relationship and she was committed to adopting him. He had lived with her

10

throughout the dependency case except for a short time after Cameron threatened her and there were concerns for her safety. Cameron has not shown a deficiency in the assessment report.

As for Cameron's argument the Agency did not provide him with an adequate opportunity to visit D.D. during his incarceration, Cameron visited only sporadically during the time he was out of custody when his custody status was not an impediment to visitation. In March 2013, when Cameron's reunification services were terminated because of his lack of participation in services, the social worker reported he had not heard from him since October 2012. Cameron had been visiting at the visitation facility, but on January 31, 2013, the facility vacated his time slot because of his many absences. When the social worker spoke with Cameron at the jail in November 2013, Cameron requested visits, and his first visit at the jail was in December. Cameron was represented by counsel during his incarceration. It was his obligation to contact his attorney or the social worker and request visits at the jail if he desired them. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416.) Assuming that Cameron has preserved these issues for appeal, he has not shown error.

DISPOSITION

The orders are affirmed.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McINTYRE, J.

11